Hyland Hunt for Adam and Tony Kazal. I'd like to reserve four minutes for rebuttal. Keep your eye on the clock and we'll try to help. Yes, Your Honor. In response to speech by Mr. David's employees accusing him of supporting terrorists and engaging in other criminal activity, Adam Kazal engaged in speech of his own. Specifically, he hired people to walk back and forth in the business, holding signs, chanting slogans, and displaying a van wrapped in graphics and text, all sending the message that Mr. David committed fraud and theft. There's no doubt that Mr. David found this distressing, as perhaps most people would, but it's core protected First Amendment activity. Speech on matters of public forum regarding accusations of criminal activity that have not been proven false, nor were even claimed to be defamatory in this case. Moreover, Adam Kazal's methods were peaceful. The police were called to the protests on several occasions. They did not disperse them. As a matter of fact, they said, look, these protesters have every right to be where they are. Mr. David himself interacted with protesters on the first day, asking them what they were doing, and reported that they didn't make any threatening gestures. They didn't make any threatening statements, and he did not fear for his safety from the protesters. What are the Kazal brothers' connections to the United States, other than hiring  So in the asset testimony, there is actually some record evidence of Tony Kazal owning some property in the United States. But where is that in the actual record here? Before this case, you know what the citation is? I'll have to look up the citation, Your Honor, to that specific page, but it's the horse farm. There's there's a record testimony about that, which I believe is a connection. And I'm not aware of any record evidence of a connection between Adam Kazal and the United States, other than the protest activity. But that is sufficient in our view, because he was speaking, albeit from afar, to a California audience engaged in speech within California. And I'm not aware of a case, and I don't think that Mr. David has cited any, that said the First Amendment doesn't apply simply because someone's a foreign national, you know, if the speech is within California. And in many cases, there's Lamont v. Postmaster General, for example, which involves a foreign speaker trying to speak in the United States by, in that case, sending material through the post. But it was expressly involved foreign material. So we don't think. Suppose, in this hypothetical, suppose there's a Russian citizen or Ukrainian citizen, pick your pick, and he or she hires protesters in the United States with the purpose of interfering in the 2020 election. Does that mean they have a First Amendment right and the U.S. government is powerless to stop that? No, Your Honor, I don't think it means the U.S. government is powerless to stop that. And in fact, with respect to, for example, campaign contributions, limitations on campaign contributions, limitations on campaign contributions, limitations on campaign contributions to the core of our electoral process, but it's not, the courts have never said in those cases, foreigners have no First Amendment interests. What they've said is there's a compelling enough government interest that relates specifically to their status as foreigners that allows us to draw this distinction and permit these restrictions. So probably in their hypothetical, there could be a similar analysis. But in this case, there's no, there's something specific to their status as foreigners that makes their especially compelling government interest in prohibiting this speech. The judgment equating this core protected activity with stalking has to be reversed for three reasons as to both defendants and a fourth with respect to Tony Kazzal. First, this case does involve speech, not conduct. It involves facially expressive waving signs, chanting slogans. That is speech, just like handing out leaflets in a realtor's neighborhood, calling him a panic peddler and asking him to- Doesn't it involve, though, following people and following members of the family in cars? Are you contending that that's speech? No, Your Honor, we're contending the surveillance activity is separately excluded from the pattern of conduct of the statute because it was conducted by a licensed private investigator. So it falls under the private investigator. But it has to be done for a specific purpose, correct? Not just to harass someone. Your Honor, actually, we believe that the better reading of the statute is that the private investigator exclusion is for any lawful activity of private investigators. And this was covert surveillance. For what purpose? For what legitimate purpose? Well- Why did they follow the children to school or follow the parents? What was the legitimate purpose? I don't actually think there's any record evidence that they followed the children to school. And as a matter of fact, Mr. Woodward testified, they didn't specifically surveil Mrs. David either. They just surveilled the house. And so she was captured in photos as part of that. So I don't believe that the record establishes following the children. But the purpose of the surveillance was, one, to check on patterns, patterns of activity, two, to gain pictures, and three, to make sure, in fact, that the protests in the van did not result in something that got out of hand. So they conducted the covert surveillance before the protests and also during them. In addition, I think, writ large, it was to gain evidence of wrongdoing in the sense that all of this is designed to get Mr. David to change his behavior and as part of that admit to wrongdoing. So I think even if that exclusion applied, it would be satisfied here. But the better reading of the statute, if the evidence gathering clause applied to private investigators, the specific reference to the licensed private investigators would be superfluous. Let me ask you this question that is in part a First Amendment question, but it's also a state statutory question. The California statute appears to incorporate some version of the First Amendment. Could you address that? Does it incorporate the First Amendment precisely? Does it incorporate the First Amendment with respect to the activity irrespective of who is doing the speech? I mean, how should I read the state statute? Well, certainly we read the reference to constitutionally protected activity to focus on the nature of the activity and not the speaker. So we do think it incorporates it without reference to the status of the speaker. We think that's. So what's your basis for that reading? I understand that's a reading that you'd like. What's the basis for the reading? Simply the reference to constitutionally protected activity as opposed to persons or bear in mind that this statutory exclusion does not need to exist for the First Amendment as applied to have effect. So the reason to incorporate it suggests to me that the California is instructing courts to look at each piece of activity and say, is this protected speech? If so, it gets excluded off the top out of course of conduct, pattern of conduct. And that's. But you might have just elided the point of my question, which is, is it possible to read the statute as saying it's irrelevant who the speaker is, whether the speaker is a foreign national or an American? But if it's purely a First Amendment question, we're confronted with the question, does it matter that the speaker is a foreign national? Now, how do you read it? Does the statute say it doesn't matter whether the speaker is a foreign national or does the statute simply incorporate the First Amendment, whatever it may happen to me? I think this statute, it certainly incorporates the First Amendment, whatever it may happen to mean. But I do think the reference to activity and the fact that there's got to be a purpose for the statutory exclusion beyond simply. You know, because any as the First Amendment would apply as applied, however, it applies without the statutory exclusion. So for that reason, I do think that the California statute is dictating an inquiry into the activity, not specific to the speaker. And asking, is that activity protected or not before you get to the point of saying, does it add up to a pattern of conduct? So we thought we hinged that our textual hook for that is the word activity as opposed to persons or in the simple fact that there is a statutory exclusion at all. But we don't think it makes a difference in this case, of course, because we think the First Amendment is implicated because this is speech to an American audience on California soil without regard to the status of the speaker. Again, we agree constitutionally the status of the speaker could affect the compelling interest analysis, but there's nothing specific to the compelling interest here that connects to status as a foreigner or not. Assuming for the moment that the First Amendment doesn't protect this activity, so assume that for purposes of my question, what's the degree of threat, if any, that's required under the California statute or to come within the definition of stalking? The degree of threat under the California statute to come under stalking is a threat of any kind. It does not have to specifically be a threat to injure or inflict bodily injury, and you can see that in the district court's decision on the motion to dismiss that the district court interpreted the statute as meaning if I threaten to continue my activities, that's enough to be a threat that causes a person to reasonably fear for their safety. But there's a requirement of fear of safety? Yes, Your Honor, that's in the definition of credible threat. It requires that the statement or whatever it is causes the person to reasonably fear for safety. And is your argument then that the activity here, apparently it's a statutory matter, the activity of the Cazal brothers did not reasonably cause Mr. David reasonably to fear for his physical safety? For that question, we have a different response for each brother. First of all, the Cazal brothers have to be addressed separately as individual defendants, and that is how the case was argued in the post-judgment motions, and there was no concerted action or conspiracy theory put before the jury in terms of a jury instruction. So, with respect to Adam Cazal, we are not challenging the sufficiency of the evidence in terms of meeting that statutory element. With respect to Tony Cazal, we are challenging that he made any sort of statement that would cause someone to reasonably fear for their safety. All he said was, I will not rest until you repay what you owe, what you stole, plus damages, apologize for your crimes, and are prosecuted, and that's not threatening. And I'd like to reserve the remainder of my time for rebuttal. I realize I went past my initial set. One more question. And what is it that Adam did that, in your view, requires you to concede that it was a threat within the meaning of the statute? Well, taking the district court's interpretation that a threat can be a threat to continue his activities in the email where he says, I will expose you, my team in L.A. are going to expose you wherever you go until you're charged with their crimes. And I'll show the good people of L.A. what scum they have allowed into their city. We don't think that's a threat to injure at all, which is why we think it's not a true threat. But you're conceding that would cause him to fear for his safety, though, under the statute, correct? Well, in our opening brief, yes, we did not bring a sufficiency of the evidence on reasonable fear. Okay, got it. Now, if you'd like to reserve, you asked for three minutes. We'll put three minutes back on the clock. Thank you. Thank you, Your Honor. Response. Thank you, Your Honor. May it please the court. Good morning. Caleb Mason, representing Mr. David and the David family. If I may, I would like to take, in order if I could, the issues raised by the court. Let's start with the last comment by counsel that the threat component here, counsel suggests, includes a, quote, threat to continued activities. That's not accurate. And in fact, I submitted in the supplemental excerpts of record, which the count did not submit, the joint instruction that was proposed jointly by the two parties and was given by the court. And this is that supplemental excerpts of record 928. And it's also we submitted the transcript of the court reading the instruction. The instruction requires, as the jury was instructed, it requires that the jury find that the plaintiff was faced with reasonable fear for his or her safety or the safety of an immediate family member. That's the instruction. There was no instruction or any suggestion to the jury that there could be a threat to continue activities without any reference to fear of safety. So that's just wrong. The jury was instructed and the jury found, consistent with the language of section 1708, that Mr. David and his family were placed in fear, reasonably so, by the activities of the Cazales. I think the second point that I would make, with respect to counsel's comments, is that counsel also misstates the language of section 1708.7 with respect to the licensed private investigator exception that you refer to. I have the statute right here. This is section 1708.7B and specifically B subsection 6. The private investigator exception for surveillance only includes, I'm quoting now, activity to obtain evidence of suspected illegal activity or other misconduct, suspected violation of an administrative rule or regulation, suspected fraudulent conduct or suspected activity involving a violation of law. The individuals at issue here, in this case, as I explained in our briefing, included at least 20, somewhere between 20 and 30 individuals. The only one who there was any evidence was a licensed private investigator was Mr. Woodward, the organizer, who gave the Cazales a discount on their bill because, as he wrote in the bill, there is, quote, no investigative activity. This was purely, as Mr. Woodward testified, a trial designed to, and this is what he was hired to do, quote, provoke and, quote, screw with Mr. David. Neither of those falls under any conceivable licensed private investigator exception. The third point that I would turn to that counsel alluded to, as the court asked, this question of how the First Amendment applies to non-U.S. citizen, non-resident, foreign nationals acting outside the United States with no ties or connections to the United States. Counsel suggested that the analysis there only goes to a compelling interest question and does not go to the nature of the right. That is absolutely false. The intellectual framework under which we're to analyze whether or not there's First Amendment protection to the Cazales. Yeah, thank you, Your Honor. The cases are the Verdugo-Urquidez case that I cited in my papers. That's the principal case. That's the Supreme Court case. Then we have the D.K.T. case from the D.C. Circuit. Both of those cases say expressly. And do we have Boumy Dien as well? I'm sorry, Your Honor. Are you aware of the case Boumy Dien? I am, Your Honor, and I do think... Are you aware of the case Ibrahim on the circuit? Yes, Your Honor. Okay. And I discussed the Ibrahim case at some length, and I think the analysis of the Ibrahim case is significant. In that case, we had a student who had temporarily gone abroad and wanted to come back in and was challenging denial of request for entry. And this court gave an extensive analysis, and I think I have the entire quote here in my brief. What the court says is that the reason Ms. Ibrahim had a claim, and I'm quoting now from page 997 of that opinion at 669F3rd, she has a significant voluntary connection with the United States. She voluntarily established this connection during her four years at Stanford pursuing a Ph.D. She voluntarily departed briefly to present the results of research. The purpose of her trip was to further her connection to the United States. She intended her stay to be brief. This court immediately then continued to hold, quote, we do not hold that tourists, business visitors, and all student visa holders have the same connection to the United States as Ibrahim. We only hold that Ibrahim has sufficient voluntary connection such that she has the, quote, right to assert claims under the First and Fifth Amendments. This court was very clear that in order to have the right— Can I stop you right there? Yes, sir. You may or may not remember, I wrote Ibrahim, so I know the case very well. Okay. Thank you. Ms. Ibrahim had a First Amendment claim, but it was not a free speech claim. It was a freedom of association claim. And it may well be that the sort of context necessary to entitle a foreigner to a freedom of association claim might be quite different from the nature of context necessary for a free speech claim. And certainly, Ibrahim doesn't answer that question. I don't think it hurts the defendants here, but I'm not sure it really answers the question. The fundamental intellectual hook under Verdugo, which we then cite in Ibrahim, is voluntary connection. And what we clearly have here is voluntary activity by the Casals. If anything, it's very voluntary. It's deliberate. It is very much focused. They have voluntarily engaged in speech activity in the United States. Why is that not a sufficient connection? Do you have any case that goes to free speech that's distinct from freedom of exercise? I do, Your Honor. Freedom of association, sorry. Yes, Your Honor. So I believe that Verdugo and also the DKT Memorial Fund case from the D.C. Circuit, that was definitely a speech case. The other two speech cases that I would point to are the two that were cited by the Casals, the appellants, in their reply brief. And that is the Klondike v. Mandel case, 408 U.S. 753. And that case and then the Lamont Postmaster's case from 1965, which is cited in the Mandel case. I think that the Klondike case is the clearest statement we get from the Supreme Court on this issue. And I would read to the court from page 762 of that case. It is the beginning of the court's analysis section. And it reads as follows. It is clear that Mandel personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this case as a non-immigrant or otherwise. The appellees concede this. Indeed, the American appellees assert that, quote, they sued to enforce their rights individually and as members of the American public and assert none on the part of the invited alien. Dr. Mandel is made a plaintiff, they say, only because he is, quote, symbolic of the problem. So the Klondike case begins and ends with the proposition that Mr. Mandel, a nonresident, noncitizen foreign speaker, has no First Amendment claim at all to be brought here. The Klondike case and the Lamont case that the court alludes to and the appellants allude to involve U.S. citizen or U.S. resident persons who are asking to hear something. They are suing because they want to receive this speech. And that's why I think it is it's not accurate for the appellants to turn to these cases and say they protect the Cazals. There's nobody in the United States asking to be harassed, threatened, stalked, etc. by the Cazals. But aren't there people who presumably would want to know about a fraudster and a criminal in their midst who live in their neighborhood? I mean, that is that may be the audience. Obviously, the Davids don't want to hear this. But the free speech element of it would be he's speaking to other people holding up signs. You should know there's a fraudster in your area. Yes, your honor. The record does not reveal any person who requested wanted this speech. It doesn't have to, does it? Why does the record have to show that? Well, I think it does, your honor, because the cases that appellant points to this Kleindienst v. Mandel principally, that is a case in which the plaintiff who is suing is suing to enforce his or her own right to receive speech. There is no party here who is suing to receive this speech. This is a claim by the Cazals from outside the United States claiming that the First Amendment gives them a right to force their speech on the Davids. There's nobody else before the court here. And there is no evidence. There was never any evidence suggested that there was anybody who requested this speech or wanted to hear it or that there was any value to it. The speech, of course, was completely false. This was simply, as I laid out in detail in the fact section of my brief, this is a long-standing vindictive campaign by the Stahl brothers to harass a former business partner. We're having trouble talking over one another. Oh, I apologize, your honor. It's certainly not your fault. It's the artifact of the video. You said the speech is completely false. Why didn't you bring a defamation claim? Because if you bring a defamation claim, you don't have any serious First Amendment problem. So if you're so convinced that it's false, I don't get it. Why is this a stalking claim instead of a defamation claim? Your honor, the reasons for that are outside my ken. I am appellate counsel only. There's nothing that I can determine in the record as to why that claim was or was not brought. It could have been a lot of reasons. But your statement just now that it's false has not been established. It cannot be false. Your honor, the evidence that was presented to the jury in this case was that it was false. My client, Mr. David, testified at length about all of these events and testified. Was the jury asked to determine the truth or falsity? The jury was not asked to determine that in this case. Mr. David, of course, to no surprise, says it's false. But you can't tell me as if it were an uncontested proposition in the case that this is false. I view that as not established. It may or may not be true. That's true of a lot of speech. Thank you, your honor. I think I'm on a little bit more solid ground to assert that because we did have a jury trial. And Mr. David testified at length explicitly that all this speech was false. The Cazals, the defendants in the case, did not put on any evidence that it was true. Why did they have to? Because this was not a defamation case. Well, they have to, your honor, if they are going to make a claim that they enjoy First Amendment protection for this speech because there's some sort of public interest and the public wants to hear it. The burden of establishing this First Amendment protection claim lies here on the appellants in this court. Counsel, why would the jury, in order to find for David, have to have concluded that what the Cazals said was false? It just had to be harassing. The jury didn't have to conclude it was false, correct? That's exactly right, your honor. The jury did not have to. It was not an element of defense. I'm simply trying to respond to Judge Fletcher's question about the falsity of the speech. No, that's not an element. And you can commit the tort under Section 1708 without regard to the truth or falsity of the speech. It's not about the speech. It's about the threat and it is about the harassment. It's about the surveillance. And in this case, it's about the extortion. And the extortion is completely separate of all of these other analyses. And that, you know, renders the speech purely unprotected as a matter of this court's black letter law. Let me ask you this. Just assume for the purpose of the question. I don't ask you for concession. But assume for the purpose of the question that the speech of the Cazals is protected by the First Amendment. Was this a true threat such that the First Amendment doesn't protect it? Yes, your honor. Tell me why it's a true threat within the meaning of the First Amendment as distinct from under the statute. Yes, your honor. So the elements of the true threat are that the speech or the conduct, the course of conduct had to be reasonably interpreted by the hearer as a threat of physical violence. And in my papers, I explained at some length why that is the case. Because this court's case law on threats, of which I've been a partner for about 10 years in making this law, requires that we look at the entire course of conduct between the parties, the speaker and the hearer, in context. And it's critically important to evaluate the hearer's knowledge of that prior relationship. And what we have here in this case is the speakers who sent hundreds, if not thousands, of these harassing, threatening emails day after day after the Davids had moved to Los Angeles to escape the Cazals following two physical assaults, which were testified about at trial. Threatening emails. Give me an example of what you consider to be particularly threatening. Give me your best example or best couple of examples of the emails that you consider threatening. Sure. It would be the emails in which the Cazals, and I do use the two together because they're joint tortfeasors, which I also think is an important point here. But it's the emails in which they say, you can't hide from us. My team can find you anywhere. Your calling the police will not help you. I will not rest. My team is going to track you down in L.A., regardless of where you are. And the context of these is that they are sent directly after this experience in which Mrs. David had been terrified by being followed and stalked by men with her children outside her house while going from her house to school. And she had called the police. And immediately thereafter, they get an email. And this is quoted on page 10 of my brief. My team in L.A. are going to expose you wherever you go. You made it personal. I will show you I'm not going to put up with the crap you tried to dish out to my brothers. Getting your hyena to scream at the L.A. police like she did yesterday is not going to stop me and my crew. I mean, this is a straightforward claim. But you read early on in that string of things that you just read. My team is going to expose you. It was not my team is going to cause physical harm. So the threat is clearly to expose. I had not yet heard a lot that tells me that there's a threat of physical harm. So the email concludes, you start a fight with me. I will show you how Adam Kazal is different to the rest of the family. Now, the question of how this was interpreted by the Davids was testified to at trial. Both Miss David and Mr. David and one of their employees testified that they absolutely interpreted this as a threat of physical violence. There was an actual incident of physical violence when one of the Kazal's hired agents banged on the block, the entrance to Mr. Kazal's office, then banged on the hood of the car of a woman trying to get in. Mr. David had personally been the victim of serious physical violence by the Kazal's agents in Australia, as had his father. The evidence in the record that the Kazal's were responsible for those incidents in Australia. Yes, that was the testimony of Mark Woodward, who was the Kazal's agent here, established that. And that was also Roger David's testimony. And that was also the basis for the restraining order that was issued by the Australian court that Adam Kazal went to prison for 18 months for violence. Was it related to the physical attacks on the father? Yes, it was related to the physical attacks on Mr. David's father and on Mr. David himself. And the one on Mr. David himself is significant because it came in the almost the identical context to what the Kazal's did to him and his family in L.A. They sent a person to follow his wife and their children to school and to sit outside the school, watching them and taking pictures. Mr. David was afraid, called Mr. David. He ran to the scene, pulled out his phone and tried to take a picture of this individual. The individual then grabbed Mr. David's phone and tried to drive away in his car. Mr. David was trying to grab the phone and got caught up on the car and had to jump on the hood, as he put it. The individual drove with Mr. David for 100 yards down the street and slammed on the brakes. Mr. David fell off the car with a windshield wiper still in his hand that he'd been holding on to. That was the context that Mr. David knew about the Kazal's and their hired agents and this specific tactic that they were now engaging in in Los Angeles. But Adam Kazal, when he wrote those emails, didn't make reference to any of that, correct? He didn't make reference to, like, remember what I did to your father or you know what happened in Australia or anything to link his current comments to those violent actions, did he? Yes, he did, Your Honor. And I think if the court reads the email and this is quoted in full on page 10 of my brief, it's on excerpts of record 205. That email makes repeated references to the conduct in Sydney, to the dispute with the father and the family in Sydney, all of the activities in Sydney and saying that he is going to escalate from what he did in Sydney because he's not going to put up with it, unlike his two brothers. In that email and that email was sent immediately after the incident in front of the David's house in Los Angeles. So this is, you know, there's reference to the father. You and your crime lord father, John David, might be used to stealing with the help of family's lapdogs. But I really don't care about any of that. You start a fight with me. I will show you how Adam Kazal is different. There are repeated references in that email to Sydney. There are repeated references in that email. But those references are in reference to what the David's did, that they're alleged stealing of the money. It's not in reference to what the Kazals allegedly did in Australia. And obviously, there will be reference to Australia because this is the genesis of the dispute. It's from the business gone bad in Australia. I don't see anything that refers to what may have happened in Australia with respect to what the Kazals did. Thank you, Your Honor. So it would be the seventh paragraph. My team in LA, I'm going to expose you wherever you go until you are charged with your crimes. And my team in Sydney will expose all of the spineless thieves who thought they could help themselves to steal from my family. Yeah, that's exposed, as Judge Fletcher said. It's referring to exposure, which is what they were doing in terms of leafletting and protesting. Yes, Your Honor. I think the case law on this is fairly clear that if I send an email to somebody saying I threatened to expose you, while at the same time sending physical agents to follow, stalk, harass and to terrify your wife and child by sending teams of men. We're talking 20 men in cars following her around the neighborhood with their children, slowly cruising by the house, taking pictures. Was that in Australia you're referring to or in the United States? That's in Los Angeles, Your Honor. Okay. That's the basis for this lawsuit. And if I send, at the same time as those physical events are going on, if I send a letter, an email that says, my team, we're going to follow you and expose you wherever you go. And getting your hyena, your wife, to call the police is not going to stop me. I mean, that's what this says. Getting your wife to call the police will not stop me. While there are teams of men outside her house, she's looking out the window, take her kids to school. This was her testimony. And this was why I was a little bit aggrieved that the appellant omitted all this testimony from the excerpts of the record. This was her testimony about her experience at her house. That was then followed immediately thereafter with the teams of people, again, 20 plus people outside Mr. David's office, blocking the entrance, banging on the cars of employees trying to get in. This email needs to be understood in the context of those contemporaneous activities which were ongoing when he sent it, as well as the prior activities in Sydney. And the question was for the jury. The jury was asked, properly instructed, to find whether Mr. David reasonably believed that these were threats of imminent physical violence. And he testified they were. That's the test. I've got a question for you with respect to the degree of threat required for a defense under the First Amendment, as distinct from the statute. Are those threats identical or is it a different level of threat? That's a tough one, Your Honor, that I don't think this court or the Supreme Court has directly addressed in the context of a California statute. But certainly I would point the court to the O'Singer case. That's one that I cited in my brief. I'll give you the I will give you the site to it. That is 753 F third at 947. And that is this court upholding the constitutionality of the federal stocking statute, which is 18 U.S.C. section 2261 A, which is virtually identical in wording to the California state statute. So I think the best I can say about that is this court has held that the identical federal statute is constitutional. The California courts have repeatedly. Let me make sure you understand my question. The First Amendment does not protect this activity if it is a true threat. So we have a definition of truth under the First Amendment. The stocking statute punishes a true threat. Is true threat defined the same way in the two statutes? I think you just told me it is, but I'm not positive that that's what you just told me. Your Honor, I think it I think it is. I mean, looking at the language of the state, is it your position that it is defined the same way in both? Yeah, absent absent authority to the contrary. I think I have to think that it is. And this is I mean, looking at the language, I ask a slightly different question. And maybe this is nuanced. Is it your position that they are the same? Your Honor, it's difficult for me to articulate a precise position on that. I don't know the answer. And I don't know that it's something that's critical to my argument. I think for purposes of this case, it might be if I were to conclude that there's no true threat under the First Amendment. At that point, I think you're about to argue all this defined differently under the statute. Yeah. Well, Your Honor, the California statute defines what it defines is the nature of the threat. And I think the question and I apologize if I'm misunderstanding. The question that I thought the court was asking is, is there conduct which is proscribed by the statute, but which is nonetheless protected under the First Amendment? And I think, first of all, I don't think that that is the case. No, I think in that sense, they're going to be coextensive. But to the extent that the California statute defines threat, that's what it defines. So what we would need would be an argument made that this statute is not constitutional, whether it has applied or on its face. That argument has never been made to my knowledge. It was not made in this case. And I believe it was waived. I mean, the only comment that was ever made at trial was one offhanded comment saying carrying signs. This is by trial counsel for the appellants. Carrying signs and leafleting is classic First Amendment activity. There was never an argument made or even hinted at at trial that there was anything unconstitutional about this statute or that the reach of the statute's threat definition was excessive constitutionally. And finally, the section 17.08.7 jury instruction was a joint jury instruction that the plaintiff and defendants jointly submitted. And I don't think that it's possible now for the appellants to say there's some sort of constitutional deficiency in the sweep of the statute. That argument was long since waived. But I do think it's also definitely my position that they do not enjoy the protections of the First Amendment at all. Now, we've taken you well over time, unless there are further questions from the bench or from the other side. Any further questions from the bench at this time? No. Thank you. You asked to reserve, to save three minutes. Let's put three minutes on the clock, and we'll see what we both need. You're muted. There we go. To start with where my colleague on the other side ended, we believe that we did not make an argument that the statute is unconstitutional because, of course, any constitutionally protected activity is carved out of the pattern of conduct element. So even if the credible threat element were satisfied, if a statement is not a true threat, the claim then fails for lack of a pattern of conduct. We do think there's daylight between the credible threat standard under the statute and true threat. We agree with the jury instruction. It recites the language of the statute, but that language does not require a threat to inflict bodily injury. It requires any kind of threat that causes someone to fear for their safety. So we think there's daylight between the two. But we point out in Planned Parenthood the statutory question and the constitutional standard were the same, and the court nonetheless undertook an independent review of the true threat question. In any event, Mr. David has only pointed to a single email as being a true threat and also, like falsity, did not put before the jury the question of intent to extort, and there's only a single email there. So none of that calls into question all of the other protected activity that's at issue here. So at a bare minimum, even if you were to find that some of that activity were not constitutionally protected, you would still have to send the case back under NAACP Claiborne Hardware, because that case says that if damages are based in part on First Amendment protected activity, the judgment has to be reversed. And we think that's clearly the case here, that the protests themselves were part of the activity. Was there ever any request to have some sort of a special verdict instead of a general verdict? Not that I'm aware of, Your Honor, but we think putting these sorts of questions, any factual predicates for the First Amendment not applying was the plaintiff's burden to bring forward because absence of constitutional protection is an element of their case under the statute, because if it's constitutionally protected activity, it's not pattern of conduct. On true threat, as I mentioned, they only pointed to one email. I would emphasize that email was by Adam Cazal and not by Tony Cazal, and there's nothing in Tony Cazal's emails that even comes close. Let me explore that. That is to say, so you're not contesting that there was coverage of the activity of Adam and that there was therefore a threat within the meaning of the statute. But your construction of the statute is that it carves out the First Amendment. Does that mean, then, that you're conceding that there's a true threat within the meaning of the First Amendment? No, Your Honor. How does that differ from here? Because it seems to me inconsistent. First, I should point out that the credible threat element could be met by either a credible threat or violation of restraining order. So it's not even like we don't even know that the jury found a credible threat in this case, even with respect to Adam, because they could have based it on the Australian restraining order. But secondly, our view is that even if there was a credible threat under the statute, if it's a true threat, it is then exerted under the pattern of conduct element, which is a separate and distinct statutory element of the tort. So Mr. David had to prove pattern of conduct that was not constitutionally protected. He also had to prove a credible threat or violation of a restraining order. So that's why there's not a concession as to the judgment overall, because the constitutional protection fails him on the pattern of conduct element. As far as the status of defendants as foreigners, I just want to point out that in the Mandel case, what the court held was that there was no constitutional right to entry. In other words, they didn't say he had no First Amendment interests, but they said the plenary immigration power trumps that. And again, that goes back to the compelling interest side of the House, not the application of the First Amendment. And also all of the cases involving plaintiffs. There's a long line of cases that allows the government to exclude people who might say, if they came into the country, things the government doesn't want to hear. That's different from someone speaking in the United States, either directly or through boxing. Yes, Your Honor. And in this case, of course, we don't have the issue of who can be a proper plaintiff to raise a First Amendment case because defendants were hailed into court. And exerted their subject to the state power of California in a jurisdictional decision we don't dispute. So we think that state power is subject to the limitations of California law equally. In addition, though, we would point out that if you watch the Exhibit 7 video, there are people who stop and talk to the protesters. So we think there is evidence in the record that there are willing U.S. listeners, although we agree that's not required. Okay. One thing Judge Lee had asked, it's an S.E.R. 878. It's a declaration from a case that has some documentation of Tony Cazal's property ownership in New Jersey. If there are no further questions from the bench, do you have anything you want to say in the last sentence or two to wrap up? My only last sentence would be that I didn't touch on the surveillance issue. Again, we think the statute applies to any licensed private investigator activity. But like the single threat email they point to or intent to extort, which they didn't put before the jury, all of that is just bits and pieces and does not cast doubt on the overall, all the protected activity, which is all of this protest activity. And so under NAACP v. Claiborne, even if pieces of it fall out, the judgment has to be reversed. And that's all I have time for. And no further questions from the bench? Okay. Both sides have hopeful arguments. And the case of, let me make sure I can read it properly, Thunder Studios v. Cazal, submitted for decision. And we are now adjourned. Thank you very much. Thank you, Your Honor. Thank you.
judges: W.fletcher, Lee, Amon